George B. LAMBERT, Plaintiff,

v.

Robert H. FINCH, Secretary of Health, Education and Welfare (Elliot L. Richardson), Defendant.

Civ. A. No. 69-C-120-A.

United States District Court,
W. D. Virginia,
Abingdon Division.

April 13, 1972.

Francis W. Flannagan, Bristol, Va., for plaintiff.

Birg E. Sergent, Asst. U. S. Atty., Roanoke Va., for defendant.

WIDENER, Chief Judge.

George Bishop Lambert applied for Old-Age Insurance Benefits on January 30, 1964. On that date, his wife, Francis Sutherland Lambert, applied for wife's Insurance Benefits. On February 25, 1964, Robert M. Ball, Commissioner of Social Security certified that the Lamberts were entitled to retirement benefits effective January, 1963. The monthly benefit was computed to be $145.30 ($94.90 for Lambert and $50.40 for his wife).

On August 31, 1966, Lambert was notified by his certified public accountant that his income had been reported under Social Security number 227–03–7470, whereas he was being paid benefits under Social Security number 227–03–9470. From the letter which was sent by the accountant, it appears that the accountant had been preparing papers for the Internal Revenue Service, and happened upon the discrepancy in the Social Security numbers. The accountant's letter showed Mr. Lambert to have self employment income of $9,423.17 for 1963, $10,944.92 for 1964, and $13,446.89 for 1965. The accountant suggested that this information be taken to the Social Security Administration. On October 3, 1966, the Social Security District Office at Norton, Virginia was notified by the regional representative that, in view of the earnings shown in the accountant's letter, benefits to the Lamberts were suspended.

On October 6, 1966, John T. Wills of the Norton District Office reported that he had called Mr. Lambert to talk about the possible overpayment and had been told that Mr. Lambert was still at his office. When Mr. Wills called the office, Mr. Lambert answered.

On October 7, 1966, Wills reported that Lambert came to the Norton District Office as he had requested. Wills reported: "I actually think this man didn't know what retirement means even tho he is very successful."

On May 9, 1967, Mr. and Mrs. Lambert were notified by the Director of Operations, Retirement and Survivors Insurance of the Social Security Administration that their benefits payable on their claim had been refigured to give credit for months of entitlement before age 65. The monthly benefits for both Mr. and Mrs. Lambert were increased. However, the letter also advised that "[i]t has been determined that you have rendered substantial services in all months for January, 1963 on, and that you have earned over $4,800.00 a year in 1963, and 1964 and 1965 and earned over $6,600.00 in 1966. . . ." The letter advised that the Lamberts had been overpaid $6,788.40 from January, 1963 through September, 1966.

On July 28, 1967, Lambert submitted a request for reconsideration of the determination that he had been overpaid. He gave as his reasons for requesting such reconsideration the following: "I am an inactive partner in two businesses—Lamberts Store, Nora, Virginia, and Home Hardware Store, Clintwood, Virginia. I never have taken an active part in the operation of either one of these businessess. [sic] The majority of my income has been derived from coal royalties."

On March 12, 1968, Mr. R. L. Kelly, Jr., of the Norton Social Security District Office reported following an interview which took place in Lambert's office. He reported that Lambert's two sons do business as Lambert Brothers Coal Co., Inc. He stated that the sons lease the coal rights and pay for the right to mine the coal by paying royalties to Lambert since Lambert owns the coal rights. Both the sons and Lambert stated to the investigator that Lambert did not work for the sons, nor was he

actively engaged in their coal mining operation. When commenting on Lambert's interests in the hardware and grocery stores, the investigator reported that: "The W/E [Lambert] does nothing around either store that is related to the operation of the stores." The investigator commented that while the Lambert family referred to the room as an office, it "could be rightly called a hang-out or family gathering place." The investigator reported that Lambert displayed an active interest in his son and step-son by visiting them daily, however, "this appears to be his main passtime [sic] and although he spends considerable time at the store-office it is not for the purpose of carrying on any business."

The investigator had Lambert sign the Social Security Administration Form 795 which is a certified statement of claimant or other person. The certified statement, signed on March 15, 1968 by Lambert, declared: "The stores are operated as partnerships. I own a share of two stores. Neither store is operated in any way by me. I make no decisions about what to buy or what to sell. I write no checks for the expenses, nor buy the necessary licenses. I only get a proportionate share of the income as a partner.

"I own mining rights on approximately 500 acres of coal land and between 4 and 500 acres of land with mining potential. My royalty is from .15 to .22 a ton on coal.

"The mineral rights are leased to my sons doing business as Lambert Coal Co. I do not do any work for the Lambert Coal Co. Occasionally I have to make a decision on the way I want the coal mined to serve my interest as the owner of the coal. This occupies most of my time. I do not maintain office hours.

"The office I speak of is located in one of the stores that I own. It is more or less a Hang Out. Before I disposed of my active interest in the stores and the coal business I used this office. It also serves as a meeting place and visiting place where me and members of my family get together.

"Since acquiring the mineral rights and land I have only disposed of one or two parcels of land to consolidate my holdings.

"I am acting on the advice of my tax adviser. I am arranging my affairs so I will have maximum income with the least effort or activity on my part."

The record contains sworn affidavits from Norman C. Sutherland, Mr. Lambert's step-son who operates the general store in Nora, Virginia, and John B. Trivitt, who operates the hardware and furniture store in Clintwood, Virginia, which substantiate the statements made by Mr. Lambert in his sworn statements to the investigator.

The record also contains copies of letters to the Social Security Administration Branch Office in Norton, Virginia from A. J. and Elmer R. Lambert, which leaves the statements of Lambert totally uncontested as to Lambert's non-participation and non-active interest in any of the business operations in which he owns an interest or in the coal operations of his sons.

On May 27, 1968, Thelma S. Gilley, a Claims Representative for the Social Security Administration Office at Norton, Virginia, requested the name and address of the President of Lambert Brothers Coal Company. Lambert replied on May 29, 1968 and declared that the business was a partnership consisting of A. J. and E. R. Lambert, doing business as Lambert Coal Company in Nora, Virginia.

On June 15, 1968, W. Foster Mullins, Chief Mine Inspector for the Division of Mines and Quarries of the Virginia Department of Labor and Industry, notified Mr. Odell Owens, Officer in Charge of the Social Security Administration Office in Norton, that according to their records, the Lambert Coal Company of Nora, Virginia was owned by A. J. and Elmer Lambert and had been since 1962. He stated that George B. Lambert

had not been connected with the coal company as an operator since 1962.

The partnership tax returns (Form 1065) for the years 1963 through 1967 were made a part of the record. The returns reflect that the Lambert Coal Company is a partnership and that A. J. and Elmer Lambert are the only partners in the business. There is a copy of a ledger sheet which is headed: "Lambert Coal Company, Royalties Paid." The sheet shows all the royalties which Lambert Coal Company paid out for the years 1963 through 1967. The ledger sheet shows that G. B. Lambert was paid the following royalties for the years indicated:

    1963—$46,157.78
    1964— 42,650.50
    1965— 36,213.08
    1966— 31,479.14
    1967— 37,021.83

On August 13, 1968, Avon B. Sykes, who has known Mr. Lambert for over 30 years and who attested to Mr. Lambert's honesty submitted a certified statement to the Social Security Administration which declared:

"As far as I know George Lambert has not worked for a long time. The hardware store in Clintwood is operated by George Lambert's son who hires a manager [and] 2 or three other employees. . . ."

On August 15, 1968, Odell Owens from the Norton Social Security Office, reported, in what appears to be an office memorandum to his superior officer, the following:

"Our investigation reveals that wage earner is *not* engaged in a partnership. This is supported by the 1966 and 1967 partnership tax returns from his sons. The letter from Mr. Mullins also establishes the fact that *his sons are operating the coal mines.*

"The tax returns as well as the sons [sic] statements establish that there is no corporation.

"Mr. Sykes in Clintwood, whom you asked us to contact also states *wage earner is not working.*

"*From every indication wage earner is not working.* He has *substantial investments* but seems to be *letting his sons handle the businesses.*

"At this point we have no other leads for contacts. Wage earner has been most cooperative. He does not hesitate to answer any questions.

"If further information is needed, please advise." [Emphasis added]

On November 27, 1968, Lambert was advised by the Social Security Administration that upon an independent reconsideration and thorough reexamination of all the evidence in his record, it had been determined that the original decision, that he had been overpaid and was not entitled to benefits, was correct and in accordance with the law and regulations.

The determination affirmed the prior decision, which, as pointed out in the reconsideration determination was that ". . . Mr. Lambert had been self-employed for many years and his earnings exceeded the retirement limitations and he performed substantial services in his business to such an extent that he could not be considered retired. . ." The reconsideration determination, which was signed by C. K. Brindell, Chief of the Reconsideration Branch of the Social Security Administration, contained the following statement:

"However, his statements along with the statements by his sons, his step-son and his store manager made in 1967 and 1968 are not as convincing as his statement made on October 7, 1966 that he never really retired, that he spends more than 100 hours a month on the job."

On December 16, 1968, Mr. Lambert requested a hearing before a hearing examiner of the Bureau of Hearings and Appeals. The hearing was held on April 30, 1969 at Bristol, Tennessee. Lambert and James M. Tayloe, Lambert's accountant, testified at the hearing.

On July 1, 1969, the hearing examiner reported his decision, which was that Lambert was engaged in substantial services in self-employment and that de-

ductions are applicable against his benefits (and those of his wife) for all months beginning with January, 1963 and continuing through September, 1966. On July 16, 1969, Lambert requested that the Appeals Council of the Social Security Administration review the hearing examiner's decision. On October 31, 1969, the Appeals Council notified Mr. Lambert that the decision of the hearing examiner was correct, thus making the hearing examiner's decision the final decision of the Secretary. On November 20, 1969, Lambert filed the present action to have his case reviewed by this court under the provisions of § 205(g) of the Social Security Act (42 U.S.C. § 405 (g)).

The parties have each moved for summary judgment.

Lambert, a life-long resident of Dickenson County, had approximately a fifth grade education. He concedes that by some modern definitions he would be considered illiterate. In 1944, he formed a partnership with his brother and used ponies to haul the coal from the mines. The partnership, Lambert Coal Company, appears to have had the folloing history of ownership:

| | |
|---|---|
| 1944–1946 | Partnership composed of G. B. Lambert and C. C. Lambert, his brother. |
| 1946–1948 | Elmer Lambert, son of G. B., and Haskel Lambert, son of C. C., became partners with their fathers. |
| 1949–1950 | L. S. Anderson, Luther Arrington, and Stallard Lambert (a cousin) operated the mine as equal partners. (G. B. and C. C. Lambert were paid a specified price per ton for use of the equipment and for the leases.) |
| 1951–1952 | W. C. Counts purchased the interest of Stallard Lambert and continued the partnership with Anderson and Arrington. |
| 1953 to August 1, 1954 | C. C. and G. B. Lambert purchased the Anderson one-third interest after he was killed at the mine. |
| August 1, 1954–July 1, 1957 | G. B. Lambert purchased the one-third interest owned by Counts and the one-third interest owned by Arrington. |
| July 1, 1957–December 31, 1960– | G. B. Lambert operated Lambert Coal Co. as a proprietorship. |
| 1961 to date | G. B. Lambert sold the company to his sons, A. J. Lambert and Elmer Lambert. |

Lambert's only interest in Lambert Coal Company since January 1, 1961 has been to collect the royalties for the coal which his sons mine and to collect payment on the equipment which he sold them January 1, 1961.

The only evidence in the record which makes questionable Lambert's right to benefits during the period in question is a statement made by him on October 7, 1966 to an employee of the Social Security Administration District Office.

The statement, which, as previously pointed out in this opinion, was the determining, if not the only, factor in denying the benefits to the Lamberts and in determining that Lambert performed substantial services follows:

> "I receive no wages from work, but I really am not retired. I am on the job more than 100 hours a month. I have never retired really but would receive the same amount if I didn't work. I spend about four hours a day at my office and about 2 hours at my store *
>
> "I receive royalties on all coal mined in my mines. Actually my sons own the mines. My step-son and I are partners in my store.*"

The statement was made in the Social Security Administration District Office following a request by an employee of the office for Mr. Lambert to come into that office. The circumstances surrounding the statement are well documented in both the Report of Contact, prepared by John T. Wills of the Norton Social Security District Office, and in the transcript of the hearing held on April 30, 1969. In his report, Wills stated:

> "*He indicated that he had been working full time as a self-employed mine operator. His sons actually own the mine but he gets so much a ton.* He is a partner in a general store with his stepson. [Emphasis not added]
>
> "*I actually think this man didn't know what retirement means* even tho he is very successful. He has, he said, been in trouble with IRS, and The National Labor Relations Board. [Emphasis partially added]
>
> ". . . . *I don't think we can successfully prosecute for fraud,* but I do think we can recoup our large overpayment." [Emphasis added]

Bearing in mind that Lambert is a man of very limited education, his explanation of the statement made at the Social Security Administration Office was adequately explained at the hearing, where he stated:

> "Q. All right, go ahead. What did you talk about? What did he say?
>
> A. Well, he commenced questioning me around what I done and he got out some little old something, a card of some kind, and read on it, said I had violated the law and he read where I could be subject to $10,000 fine and so many year in prison, and what all, I don't know what all he did claim that he could do to me and I told him if I'd done anything wrong I didn't know it.
>
> Q. All right, did he write out something for you to sign?
>
> A. Yes. He first says your Social Security will stop and said you're not going to leave this office till you sign this thing, and he wrote out something.
>
> Q. Is this your signature on exhibit number 10?
>
> A. I guess it is, yeah.
>
> Q. Would you read exhibit number 10 to me? You signed it. You read it to me.
>
> A. No, I *couldn't read it enough to get all that's in it* out of it.
>
> Q. In other words you signed something that was written by the examiner but you actually couldn't even read it?
>
> A. That's right.
>
> Q. All right, now let me read it to you. 'I receive no wages from work, but I really am not retired.'
> Did you say that?
>
> A. That's right. Well, I meant by retired I was still seeing about my own interests.
>
> Q. What were you doing that you meant 'I wasn't retired?' What kind of work were you doing?
>
> A. We done went over that. *I was seeing about that the mines was mined properly according to law, see that the leases, the mine didn't cross the boundary line, different things that you got to—somebody just had to do that.*
>
> Q. All right. You have a little farm as a hobby. Do you work on that?
>
> A. Small amount.

Q. Did you mean by that—that work, that you weren't retired too?

A. That's right, and of course, these two year I spent a right smart much time trading. And if you trade you've got to get off to yourself and make some decisions and figure out whether it's going to be a profitable thing or not. I call that—well, I'd call that, you're busy. I don't know whether you'd want to call it retired or not.

Q. In other words, you meant by— because you were doing this work that you've just described that you didn't consider yourself retired? Isn't that right?

A. That's right.

Q. Now the next thing, 'I am on the job more than 100 hours a month.' What job are you talking about? The same job you've just mentioned.

A. Around the mines, yeah. Well, I was off this—there was one time six months I wasn't hardly at the mine. My wife was in the hospital. Of course, a month or two there at one time, three or four months I wasn't hardly at the mines when I was making those trades. Clinchfield was pushing me on one of those trades. There was 40 or 50 people involved and you had to trace them down. I got after one fellow, got after me, ordered me off his place. One time thought I was going to get shot. Just all things of that nature.

Q. All right, sir, now you also say, 'I spend about 4 hours a day at my office and about 2 hours at my store.' Well, you've already described that the store and the office are in the same building, is that correct?

A. Yes, that's right.

Q. Now is any of that 4 or 2 hours a day spent in business for the store?

A. No.

Q. Do you know what the expression "self-employment income" means, Mr. Lambert, as used in the Social Security Act?

A. Self-employment, well, self-employed if I'm seeing about my own business.

Q. Is that what you think self-employed means?

A. I think so.

Q. Now in 1964 when you applied for Social Security benefits you stated that you had not been working for wages nor self-employed.

A. That's right.

Q. What did you mean by self-employed there?

A. I meant I hadn't been drawing a salary from Lambert Coal Company or the stores.

Q. Or hadn't been working for wages?

A. That's right.

Q. That's also indicated in one of the reports filed with your file in the Social Security that you have been in trouble with the IRS. Now the IRS is the Internal Revenue Service. Have you ever been in trouble with the Revenue people?

A. I was checked once, but it never cost me a penny.

Q. You've never been in trouble with it then, have you?

A. I don't think that would be trouble. . . ." [Emphasis added]

Exhibit number 10 referred to at the hearing is the statement made by Mr. Lambert which was quoted in full previously in this opinion. It is obvious from the record that Lambert considers retirement to be when one idly rocks away his time or does absolutely nothing. This erroneous concept of retirement was apparently shared by the Social Security Administration in this case. The court is aware of no law or regulation which would deny Mr. Lambert his Social Security benefits merely because he shows an interest in the efficient operation of his financial holdings. The record leaves the definite impression that Mr. Lambert is an honest man of limited education who has depended a great deal on his attorneys and accountants to advise him

on technicalities. There can be no doubt that he has a great deal of innate business judgment and has been very successful financially. His presence at his mines and stores appear to be for the legitimate purposes of checking on his royalties, occupying his time, and enjoying the presence of his family. The record does not permit the assumption that Lambert's presence, while not solicited by the sons, to be substantial employment. The March 12, 1968 report by the Social Security District Office investigator R. L. Kelly, Jr., pointed out that Lambert displayed an active interest in his sons and step-son by visiting them daily at the general store. He indicated that this was Mr. Lambert's pastime and that although this consumed a considerable amount of Mr. Lambert's time, *"it is not for the purpose of carrying on any substantial service in the operation of any business."* [Emphasis added] The court considers that Kelly's report should be given much greater weight than it was given by the Secretary. Indeed, the report appears to have been given no weight at all, although Kelly was the only Social Security Administration person who actually had a first-hand acquaintance with the relationship and environment of the Lambert family. He is the only person outside the family and business associates who acquainted himself in detail with the day-to-day activities of Lambert, and the extensive Report of Contact which was prepared by Kelly on March 12, 1968 will not be ignored by this court as it was by the Secretary. Kelly's findings substantially support all the statements made by the Lamberts to the effect that Mr. Lambert does not perform any substantial service in the operation of any business.[1] When discussing Lambert's involvement with his stores, Mr. Kelly states that Lambert was "a partner in name only." He states that Lambert did "nothing around either store that is related to the operation of the stores. . . . He performs no manual labor." Kelly reported that Lambert "started out mining coal then started operating the store. He then began purchasing mining rights and mining lands. When he accumulated coal lands and mining rights he helped (financially) his two sons and his step-son get started in business. *They have gradually taken over the operation of these businesses."* [Emphasis added]

Kelly declared his impression to be: "that Mr. George Lambert worked and accumulated coal holdings and two mercantile businesses plus rental buildings which provide him with an income for which he worked until 1963. In 1963 he transferred the responsibility of operating the business to his step-son. He also backed his sons in the coal mining business."

§ 205(g), 42 U.S.C. § 405(g), relating to judicial review, provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . ." The case law is to the same effect. Lewis v. Celebrezze, 359 F.2d 398 (4th Cir. 1966); Sabbagha v. Celebrezze, 345 F.2d 509 (4th Cir. 1965).

This court finds that the evidence, viewed as a whole, when considered with the applicable laws and regulations, permits only the conclusion that Lambert does not render substantial service to any business enterprise.

The specific issue to be determined in this case is whether the decision of the Secretary was supported by substantial evidence when it was determined that Lambert had been or was continuing to render substantial services in the operation of the coal mines. The court finds that the evidence is overwhelming that he did not. There is no issue as to fraud in this case, for the hearing examiner pointed out: "We're not dealing with any

1. The report of Social Security Administrator O'Dell Owens, dated August 15, 1968 (Tr. p. 210) was also ignored by the Secretary. It is in general the same as Kelly's, but not as detailed, and is to the effect that Lambert is not working and his sons are handling the business.

matter of fraud here, anyway, so I hope you're assured of that."

Section 211 of the Social Security Act (42 U.S.C. § 411) provides:

"(a) The term 'net earnings from self-employment' means the gross income, as computed under Subtitle A of the Internal Revenue Code of 1954, derived by an individual from any trade or business carried on by such individual, less the deductions allowed under such subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in § 702(a) (9) of the Internal Revenue Code of 1954, from any trade or business carried on by a partnership of which he is a member; except that in computing such gross income and deductions and such distributive share of partnership ordinary income or loss

"  *   *   *

"(3) There shall be excluded any gain or loss  *   *   *, (B) from the cutting of timber or the disposal of timber, coal, or iron ore, if § 631 of the Internal Revenue Code of 1954 applies to such gain or loss  *   *   *."

The regulations of the Secretary of Health, Education and Welfare, 20 CFR 404.1055(a) state that:

"(a) There is excluded, in determining net earnings from self-employment, any gain or loss:

"  *   *   *

"(2) From the cutting of timber or the disposal of timber or the disposal of coal, even though held primarily for sale to customers, if § 631 of the Internal Revenue Code of 1954 is applicable to such gain or loss  *   *   *."

Section 631 of the Internal Revenue Code of 1954, 26 U.S.C.A. 631, provides:

"(c) *Disposal of coal or domestic iron ore with a retained economic interest.* —In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form

of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore, and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under § 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in § 613 with respect to such coal or iron ore. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word 'owner' means any person who owns an economic interest in coal or iron ore, in place, including a sublessor. The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection . . ."

Considering the uncontradicted and undenied testimony of Lambert's accountant, and the manner in which the income from the coal royalties was treated, there is no way in which, under applicable law and regulations, Lambert's gains from the disposal of his coal could be considered self-employment income.

Section 203(f) (4) (A) of the Act, 42 U.S.C.A. § 403(f) (4) (A), creates a presumption of earnings as follows:

"An individual will be presumed, with respect to any month, to have been engaged in self-employment in such month until it is shown to the satisfaction of the Secretary that such individual rendered no substantial services in such month with respect to any trade or business the net income or loss of which is includable in comput-

ing (as provided in paragraph (5) of this subsection) his net earnings or net loss from self-employment for any taxable year. The Secretary shall by regulations prescribe the methods and criteria for determining whether or not an individual has rendered substantial services with respect to any trade or business."

The regulations of the Secretary pertaining to "substantial services" are set forth at 20 CFR 404.446 as follows:

"(a) *General.* In general, the substantial services test is one of whether, in view of all the services rendered by the individual and the surrounding circumstances, the individual can reasonably be considered retired in the month in question. Even though an individual performs some services in a trade or business in a month, such services are not substantial where the evidence establishes to the satisfaction of the Administration that the individual may reasonably be considered retired in that month. In determining whether an individual has or has not performed substantial services in any month, the following factors are considered:

"(1) The amount of time the individual devoted to all trades and businesses;

"(2) The nature of the services rendered by the individual;

"(3) The extent and nature of the activity performed by the individual before he allegedly retired as compared with that performed thereafter;

"(4) The presence or absence of an adequately qualified paid manager, partner, or family member who manages the business;

"(5) The type of business establishment involved;

"(6) The amount of capital invested in the trade or business, and

"(7) The seasonal nature of the trade or business.

"(b) *Individual engaged in more than one trade or business.* When an individual, in any month, performs services in more than one trade or business, his services in all trades or businesses are considered together in determining whether he performed substantial services in self-employment in such month.

"(c) *Evidentiary requirements.* An individual who alleges that he did not render substantial services in any month, or months, shall submit detailed information about the operation of the trades or businesses, including the individual's activities in connection therewith. When requested to do so by the Administration, the individual shall also submit such additional statements, information, and other evidence as the Administration may consider necessary for a proper determination of whether the individual rendered substantial services in self-employment. Failure of the individual to submit the requested statements, information, and other evidence is a sufficient basis for a determination that the individual rendered substantial services in self-employment during the period in question."

The regulations also provide at 20 CFR 404.447 criteria for evaluation of factors involved in the substantial services test:

"In determining whether an individual's services are substantial, consideration is given to the following factors:

"(a) *Amount of time devoted to trades or businesses.* Consideration is first given to the amount of time the self-employed individual devoted to all trades or businesses, the net income or loss of which is includable in computing his earnings as defined in § 404.429. For the purposes of this paragraph, the time devoted to a trade or business includes all the time spent by the individual in any activity, whether physical or mental, at the place of business or elsewhere in furtherance of such trade or business. This includes the time spent in advising and

planning the operation of the business, making business contracts, attending meetings, and preparing and maintaining the facilities and records of the business. All time spent at the place of business which cannot reasonably be considered time devoted to the trade or business. In considering the weight to be given to the time devoted to trades or businesses the following rules are applied:

"(1) *Forty-five hours or less in a month devoted to trade or business.* Where the individual establishes that the time devoted to his trades and businesses during a calendar month was not more than 45 hours, the individual's services in that month are not considered substantial unless other factors (see paragraph (b), (c), and (d) of this section), make such a finding unreasonable. For example, an individual who worked only 15 hours in a month might nevertheless be found to have rendered substantial services if he was managing a sizeable business or engaging in a highly skilled occupation. However, the services of less than 15 hours rendered in all trades and businesses during a calendar month are not substantial.

"(2) *More than 45 hours in a month devoted to trades and businesses.* Where an individual devoted more than 45 hours to all trades and businesses during a calendar month, it will be found that the individual's services are substantial unless it is established that the individual could reasonably be considered retired in the month and, therefore, that such services were not, in fact, substantial.

"(b) *Nature of services rendered.* Consideration is also given to the nature of the services rendered by the individual in any case where a finding that the individual was retired would be unreasonable if based on time alone (see paragraph (a) of this section). The more highly skilled and valuable his services in self-employment are, the more likely the individual rendering such services could not reasonably be considered retired. The performance of services regularly also tends to show that the individual has not retired. Services are considered in relation to the technical and management needs of the business in which they are rendered. Thus, skilled services of a managerial or technical nature may be so important to the conduct of a sizeable business that such services would be substantial even though the time required to render the services is considerably less than 45 hours.

"(c) *Comparison of services rendered before and after retirement.* Where consideration of the amount of time devoted to a trade or business (see paragraph (a) of this section) and the nature of services rendered (see paragraph (b) of this section) is not sufficient to establish whether an individual's services were substantial, consideration is given to the extent and nature of the services rendered by the individual before his 'retirement,' as compared with the services performed during the period in question. A significant reduction in the amount or importance of services rendered in the business tends to show that the individual is retired; absence of such reduction tends to show that the individual is not retired.

"(d) *Setting in which services performed.* Where consideration of the factors described in paragraphs (a), (b), and (c) of this section is not sufficient to establish that an individual's services in self-employment were or were not substantial, all other factors are considered. The presence or absence of a capable manager, the kind and size of the business, the amount of capital invested and whether the business is seasonal, as well as any other pertinent factors, are considered in determining whether the individual's services are such that he can reasonably be considered retired."

In explaining the amount of time he spent at the mine, Lambert explained at the hearing:

"Well, I go to see that it's mined properly and I—in another sense I get enjoyment out of seeing something come out that pays me . . ."

When asked if he ever visited coal property once he leased it, Mr. Lambert replied:

"Oh, yeah. We have to spend some time watching operator that he don't cross the boundary line . . . but they could go in there and mine somebody else's coal. . . I just go about every day or two and see whether the royalty was supposed to be coming to me or going to the other fellow."

Watching over one's landholdings to see that royalties are properly credited and watching one's sons continue a business are not at all atypical actions by a father who has spent a large part of his life establishing business interests and then turned them over to his sons. This is obviously what Lambert meant when he discussed his sons' lack of experience in reading the maps. The entire statement, however, leaves no doubt that the sons have experienced employees who read the maps, for Lambert's entire statement was:

"Well, the bosses come in there and look at those maps if they want to. My boys don't have much mine experience. If you don't have much mine experience you couldn't look at a map and tell much about it."

This statement, when considered with his other testimony, could only signify that Lambert wanted to assure that the royalties for the coal were properly credited and accounted for.

■ The report of the hearing examiner which cited no cases and which was approved by the Appeals Council without comment, except that it was correct, is worthy of analysis. The examiner found as a fact that Lambert rendered substantial services to the coal company at all times during the critical period, and it necessarily must be inferred from the report that the examiner found as a fact that Lambert did not render substantial services to the grocery or hardware stores during the critical period, for the report states that ". . . even though claimant takes no active part in the operation of the grocery or hardware stores, any income received from these interests becomes, as result of substantial services rendered to the coal company, includable in his net earnings from self-employment." See Tyndall v. Gardner, 376 F.2d 746 (4th Cir. 1967). The critical question then, and really the only question in the case, is whether Lambert rendered substantial services to the coal company. The report of the examiner arrives at an affimative answer by the following route. He is entitled to inquire into the bona fides of the transfer of the business from George Lambert to his two sons, in light of the requirements of the Social Security Act, to determine whether Lambert continued to render substantial services to the coal company. See Poss v. Ribicoff, 289 F.2d 10 (2nd Cir. 1961). He found that Lambert keeps maps of the coal lands; that he rendered supervisory and managerial services to the partnership; and that he was the dominant force in the coal extracting operations of the partnership. Because of this, the examiner found that Lambert rendered substantial services within the meaning of the statute. Along the line, the examiner referred to the royalties received by Lambert as "so-called 'royalties'," a clear inference that the examiner believed the royalties paid Lambert were not in fact royalties but some kind of subterfuge. The report does not mention the exemption in the statute for payments under § 631 of the Internal Revenue Code of 1954. 42 U.S.C. § 411(a) (3), which has been repeated in 20 C.F.R. 404.1055.

The conclusions of the examiner that Lambert is the dominant force in the coal extracting operations; that he renders supervisory and managerial services to the partnership; and that the royalties received by Lambert are not, in fact, royalties, are not corroborated in the

slightest detail by any evidence in the record, substantial or otherwise.

The testimony of the accountant is undisputed and documented that the transfer from Lambert to his sons was bona fide and that many thousands of dollars in royalties have been paid to Lambert since the transfer, as well as many thousands of dollars on the purchase price, as the sons have also been paying Lambert for the transfer of the business. The coal lease from Lambert to his sons is in substantially the same terms as the one from New York Mining Company to the sons. In line with this, the record shows that the Lambert sons, Arlie James and Elmer R., were, in fact, sued in this court in 1964 by the Secretary of Labor on account of an alleged violation of the Fair Labor Standards Act; that the case was tried in 1965; and that the finding of the court was in favor of the defendants. George B. Lambert was not sued as a partner. All books, records and papers of, or referring to, the partnership, including the records of the State of Virginia, show the partnership to be owned by the sons to the exclusion of the father.

The record further shows that far from being the dominant force in the partnership, George Lambert had little or nothing to do with it other than to see that the royalty payments received by him came from his lands, as opposed to the lands of others on which the partnership was working. The record discloses substantial royalty payments during the years in question to New York Mining Company, Bird, McCowan, Clinchfield Coal Company, Caledonia Coal Company, Boyd, McFaddin, Banner Splash Dam Coal Company, Allen Land Company, and Crabtree, as well as to G. B. Lambert. This evidence was completely ignored by the examiner in his opinion. The record is uncontradicted that the only time spent in the partnership mines by George Lambert was spent in seeing that his royalties were correctly computed for the coal mined. No other decision or service of any kind is shown by the record. It is the opinion of the court that there is no more activity on the part of George Lambert than any owner of coal lands living largely on royalties would properly undertake to look out after his property.

Although the court must affirm the finding of the Secretary if supported by substantial evidence, it cannot be overlooked that substantial evidence is defined as more than a scintilla but less than a preponderance of the evidence. Although the courts are not to try the cases *de novo*, they must not abdicate their traditional functions. They cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964). " . . . if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary." *Thomas* at p. 543.

It is quite apparent that the examiner, in his opinion, and the Secretary have relied solely, or almost solely, on the one statement made by Lambert on October 7, 1966, which has been quoted above in full, and that they have disregarded almost all of the other evidence in the record relevant to the operation of the partnership. Other than the statement of October 7, 1966, and the Social Security agents' comments on it, there is not a scintilla of evidence in the record to support the finding of fact that George Lambert rendered substantial service to the coal company. All of the evidence is to the contrary, including evidence supplied to the Secretary by his own investigators. The examiner has further ignored the perfectly rational explanation of the October 7, 1966 statement which was taken in quite unusual circumstances (which are unexplained and undenied) from a semi-literate man by an official of the Social Security Administration for the obvious purpose of denying the claim. The testimony of the accountant is undenied that the money has been received by Lambert as royal-

ties, as is his testimony that the transfer from Lambert to his sons was bona fide. The record shows a complete absence of any managerial decision on the part of Lambert after the transfer. The record shows that the Lambert sons had capable people working for them who were able to read the coal mine maps as to the operations without the help of George Lambert and that no advice from Lambert was received or given as to where they should mine. The conclusion that Lambert was the dominant force in the partnership after its sale to his sons is completely without foundation in the record, even including the statement of October 7, 1966.

The fact that Lambert keeps maps of his coal lands and keeps account of his royalties, the court believes to be acts which are entirely consistent with his living largely on royalties. Granted, Lambert's income from royalties is large, nevertheless the mere fact that he keeps up with the source of his royalties and sees that they are properly paid to him should not be, and is not, the proper foundation for an inference that he is managing the coal operations which produce the royalties. The examiner ignored the fact that the lease from Lambert to the partnership is substantially the same as from New York Mining Corporation to the partnership.

■ To summarize, it is the opinion of the court that the decision of the Secretary is not supported by substantial evidence. Perhaps, and only perhaps, a scintilla of evidence may support the decision, but no more than that. It is the opinion of the court that the Secretary's decision has not considered the record as a whole, and that it has reached conclusions which are not rational when based on the record as a whole. It is further the opinion of the court that misplaced reliance has been placed by Secretary on the statement of October 7, 1966 to the disregard of overwhelming evidence to the contrary in the balance of the record. *Thomas,* supra.

The Constitutional issue raised by the plaintiff as to deductions from earned Social Security payments has not been decided since the Secretary's decision has been reversed on other grounds. Rosado v. Wyman, 397 U.S. 397, 402, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Since this decision is favorable to the claimant, the question of the return overpayments to the Secretary has also not been considered.

An order is this day entered consistent with this opinion.